Harris v Reagan (2023 NY Slip Op 05558)

Harris v Reagan

2023 NY Slip Op 05558

Decided on November 2, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:November 2, 2023

533292
[*1]Calvin L. Harris, Appellant,
v
Joseph C. Reagan, Respondent.

Calendar Date:September 12, 2023

Before:Egan Jr., J.P., Lynch, Ceresia and Fisher, JJ.

Bellavia Blatt, PC, Mineola (Leonard A. Bellavia of counsel), for appellant.
Harris Beach PLLC, Pittsford (Kelly S. Foss of counsel), for respondent.

Per Curiam.
Appeal from a judgment of the Supreme Court (Brian D. Burns, J.), entered January 13, 2021 in Otsego County, upon a decision of the court in favor of defendant.
Plaintiff, defendant and a nonparty owned and operated two automobile dealerships and their associated real estate in Cortland County. In 2005, plaintiff was charged with the murder of his wife, an event which triggered a series of agreements between the dealership owners.[FN1] Initially, and as a direct result of plaintiff's arrest on the charges, the nonparty sold his stock and real estate interests in both dealerships to the parties, thereby resulting in plaintiff and defendant being the only shareholders, with plaintiff having 45% and defendant having 55% of the shares in each dealership. Thereafter, precipitated by the fear that the automobile manufacturers would terminate the franchise status of both dealerships due to plaintiff's legal situation, plaintiff and defendant entered into two additional agreements. A shareholders' agreement established a process where, if plaintiff was convicted and upon the expiration of his statutory appeals, he would sell his ownership interests to a trust for the benefit of his children, whereby defendant would purchase such interests by making monthly payments to the trust in the amount of $15,000 for a period of 20 years. In the event that plaintiff was ultimately acquitted, a side agreement provided that plaintiff's ownership interests would increase to 75%, thereby resulting in a corresponding reduction of defendant's ownership interests to 25%. According to plaintiff, the shareholders' agreement also contained a footnote providing that, if he was acquitted, the monthly payments made by defendant would constitute a "salary" and plaintiff's shares would be transferred back to him.
In May 2007, plaintiff was convicted by a jury and, while he was awaiting sentencing, he participated remotely in a joint meeting of the shareholders for the dealerships. During such meeting in June 2007, plaintiff agreed to transfer his ownership interests to defendant in a manner that was "generally consistent with the terms" of the shareholders' agreement, whereby defendant also agreed to assume all of the outstanding debt of the dealerships. As a result, plaintiff's ownership interests were subsequently conveyed to defendant, who then began making monthly payments in the amount of $15,000 directly to plaintiff. Thereafter, plaintiff successfully moved to set aside the verdict pursuant to CPL 330.30, which this Court affirmed (People v Harris, 55 AD3d 958 [3d Dept 2008]). Plaintiff was again convicted in 2009 and began serving his sentence, however, this conviction was similarly vacated and a new trial ordered (People v Harris, 19 NY3d 679 [2012]). After a third trial which ended in a hung jury, plaintiff was ultimately acquitted at the conclusion of a bench trial in 2016.
Following his acquittal, plaintiff commenced this action asserting several causes of action for breach [*2]of contract and seeking specific performance of the shareholders' agreement.[FN2] Specifically, plaintiff demanded that defendant retransfer him the ownership interests in the dealerships and associated real estate pursuant to the shareholders' agreement and the side agreement. He further contended that defendant's $15,000 monthly payments constituted a salary pursuant to the footnote of the shareholders' agreement. In lieu of serving an answer, defendant moved pre-answer to dismiss the complaint for failure to state a cause of action, arguing, in part, that the shareholders' agreement had already terminated by virtue of the June 2007 transfer and, alternatively, that the version of the shareholders' agreement that the parties signed did not include a footnote. Supreme Court (O'Shea, J.) granted defendant's motion and plaintiff appealed, whereafter this Court reversed and reinstated the complaint, finding that "[d]iscovery [was] . . . needed to discern the actual provisions of the agreements, the intent of the parties in entering into them and the extent to which they survived after defendant became the sole shareholder in the dealerships" (161 AD3d 1346, 1349 [3d Dept 2018]).[FN3] In doing so, this Court acknowledged the possibility that the parties may have intended to be bound by the expired agreement or that they had come to a separate agreement (see id.).
After joinder of issue and the completion of discovery, the matter proceeded to a nonjury trial. Supreme Court (Burns, J.) ultimately found that plaintiff failed to prove by a preponderance of the evidence the existence of an enforceable contract, agreeing with defendant that the contract terminated in June 2007 and rejecting the existence of the footnote. In this respect, the court weighed the credibility of the parties, finding plaintiff to be less credible as to the version of the shareholders' agreement that the parties signed and their intentions during the June 2007 transfer. Nevertheless, the court further determined that plaintiff's version of the shareholders' agreement would have rendered the contract illusory and invalid due to the lack of consideration. As a result, the court found in favor of defendant and dismissed the complaint. Plaintiff appeals.
We affirm. "When conducting a review of a nonjury trial verdict, this Court independently reviews the probative weight of the evidence, together with the reasonable inferences that may be drawn therefrom, and grants the judgment warranted by the record while according due deference to the trial court's factual findings and credibility determinations" (Ampower-US, LLC v WEG Transformers USA, LLC, 214 AD3d 1129, 1130 [3d Dept 2023] [internal quotation marks and citations omitted]). Relevantly, "it is fundamental that specific performance may be awarded only where there is a valid existing contract for which to compel performance" (Galarneau v D'Andrea, 184 AD3d 1064, 1065 [3d Dept 2020] [internal quotation marks, brackets and citations omitted[*3]]). In order to establish a valid existing contract, "the plaintiff must demonstrate that there was an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound" (Carroll v Rondout Yacht Basin, Inc., 215 AD3d 1190, 1191 [3d Dept 2023] [internal quotation marks and citations omitted]; see TAJ Intl. Corp. v Bashian & Sons, 251 AD2d 98, 100 [1st Dept 1998]). Although a party's rights and obligations under an agreement typically cease after its termination (see New York Tel. Co. v Jamestown Tel. Corp., 282 NY 365, 371 [1940]; Harris v Reagan, 161 AD3d at 1348), "the conduct of the parties to a contract following the expiration of that contract can operate to demonstrate that the parties impliedly agree that their rights and obligations should continue to be measured as provided in the old contract" (Monahan v Lewis, 51 AD3d 1308, 1309-1310 [3d Dept 2008] [internal quotation marks, ellipsis and citations omitted]; see Richmor Aviation, Inc. v Sportsflight Air, Inc., 82 AD3d 1423, 1424 [3d Dept 2011]). To make this determination, such evaluation by a court "involves an assessment of the parties' conduct and the extent to which such conduct demonstrates a meeting of the minds" (Monahan v Lewis, 51 AD3d at 1310), as "[t]he fact that the parties continue to deal under some sort of informal arrangement does not, without more, mean that all the terms of the expired formal contract continue to apply" (Twitchell v Town of Pittsford, 106 AD2d 903, 904 [4th Dept 1984], affd 66 NY2d 824 [1985]; see Coogi Partners LLC v Soho Fashion, Ltd., 107 AD3d 426, 427 [1st Dept 2013]; Bessette v Niles, 23 AD3d 996, 997 [4th Dept 2005]).
Here, section 6 (d) of the shareholders' agreement required, in the event that plaintiff was convicted, that defendant purchase all of plaintiff's ownership interests in the dealerships and their associated real estate by making payments of $15,000 per month for 20 years. Section 7 (a) provided that plaintiff "hereby agrees and covenants with [defendant] that, in the event of his conviction, he shall immediately transfer his shares" in the dealerships to a trust for the benefit of plaintiff's children, which "shall be an irrevocable transfer of his shares to [defendant], through the [t]rust." This section further provided that "[t]his transfer shall be made by [plaintiff] upon the conviction and expiration of all statutory appeals." Further, the shareholders' agreement contained a severance clause, requiring any invalid, illegal or unenforceable part of the agreement to be severed to maintain the validity of the remaining terms. Importantly, pursuant to its own terms, the shareholders' agreement would terminate when there is only one remaining shareholder.
At trial, it was undisputed that plaintiff and defendant were the only shareholders of the dealerships when they signed the shareholders' agreement and side agreement. According to plaintiff, his initial conviction triggered his obligations under the shareholders' [*4]agreement to transfer his ownership interests to defendant. When he did this at the joint meeting of shareholders in June 2007, plaintiff testified that it was his understanding that the transfer was not yet permanent, but subject to the parties' agreements and the expiration of his appeals.[FN4] After this meeting, plaintiff testified that he continued to manage the dealerships while he was imprisoned and, after the first time he was released and awaiting his next trial, that plaintiff worked in the dealerships. Plaintiff testified that upon being finally acquitted, defendant refused to transfer back his shares.
The burden was on plaintiff to establish "the existence, terms and validity of a contract" (Galarneau v D'Andrea, 184 AD3d at 1067 [internal quotation marks and citations omitted]; see Cordero v Transamerica Annuity Serv. Corp., 39 NY3d 399, 410 [2023]). Upon our independent review of the evidence adduced at trial, we agree with Supreme Court that this burden was not satisfied (see Ampower-US, LLC v WEG Transformers USA, LLC, 214 AD3d at 1132). Although plaintiff testified that it was his understanding that he was acting within the shareholders' agreement when he transferred his ownership interests to defendant at the June 2007 meeting, this is belied by the record. Notably, the stock powers and property deeds signed by plaintiff were transferred directly to defendant, instead of into a trust for the benefit of his children like the shareholders' agreement required. These outright transfers were reflected in the relevant tax documents of both parties, particularly the K-1 forms sent to them in 2007 and each subsequent year.[FN5] Since the ownership interests were not transferred into a trust as prescribed by the shareholders' agreement, but directly to defendant, he correspondingly remitted his monthly payments directly to plaintiff, who continued to accept these payments without objection and without questioning why they were being remitted directly to him and not to the trust as required by the shareholders' agreement. As recorded by the meeting minutes for each of the dealerships, these transfers were completed with the additional agreement that defendant would assume the dealerships' debt in the amount of approximately $2.6 million — another term not included in the shareholders' agreement. As a result of this transaction, defendant became the only remaining shareholder in June 2007, therefore terminating the shareholders' agreement.
The record does not demonstrate that, following such termination, the parties intended to be bound by the shareholders' agreement after its expiration (see Coogi Partners LLC v Soho Fashion, Ltd., 107 AD3d at 427; Bessette v Niles, 23 AD3d at 997). Contrary to plaintiff's testimony, the record demonstrates that, after the June 2007 transfer, he stopped receiving health benefits, no longer had a fuel card, did not pay toward dealership debts, did not receive related tax forms, did not receive business reports and [*5]did not exercise any voting rights. Although defendant acknowledged that plaintiff had come to a dealership in between his trials, defendant testified that plaintiff was sequestered in a private office and was not interacting with staff or customers, nor was plaintiff handling any of the dealerships' business affairs. In light of this conflicting testimony, we defer to the credibility determinations of Supreme Court, which found that defendant was more credible than plaintiff (see LaPenna Contr., Ltd. v Mullen, 187 AD3d 1451, 1454 [3d Dept 2020]). Indeed, our independent review of the record reveals several instances where plaintiff portrayed himself as an unreliable narrator of the June 2007 transaction and the injection of the footnote into the shareholders' agreement, repeatedly offering testimony that conflicted with his prior sworn deposition testimony, sworn pleadings and even his trial testimony offered the prior day.
To that end, we reject plaintiff's arguments related to the purported footnote [FN6] contained in only his version of the shareholders' agreement, as the record fails to credibly demonstrate that the parties had contemplated or agreed to such term (see TAJ Intl. Corp. v Bashian & Sons, 251 AD2d at 100), and, if they had, we agree with Supreme Court that such claim fails for a lack of consideration (see Lend Lease [US] Constr. LMB Inc. v Zurich Am. Ins. Co., 28 NY3d 675, 684-685 [2017]). We also find unpersuasive plaintiff's argument that defendant failed to repudiate the footnote after discovering it in 2008, as defendant testified that he believed the shareholders' agreement had terminated in June 2007 when he became the only shareholder and, therefore, that he did not see a reason to refute it at that point.[FN7] Accordingly, we find that the record supports the judgment rendered by the trial court, and we perceive no reason to disturb it (see Carroll v Rondout Yacht Basin, Inc., 215 AD3d at 1193; Ampower-US, LLC v WEG Transformers USA, LLC, 214 AD3d at 1132). In doing so, we reject the remaining contentions of the parties as without merit or academic.
Egan Jr., J.P., Lynch, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment is affirmed, with costs.

Footnotes

Footnote 1: Notably, the agreements were drafted by the long-time attorney for the dealerships and plaintiff's family, who subsequently passed away before trial.

Footnote 2: In 2014, during the pendency of this third trial, plaintiff commenced an action against defendant. He alleged that the transfer of his interests to defendant was obtained by fraud and therefore sought a judicial declaration in his favor. Supreme Court (O'Shea, J.), dismissed that action in 2015, finding that plaintiff's challenge to the transfer was properly one for breach of contract and was therefore time-barred.

Footnote 3: After the complaint was reinstated, defendant moved for an order directing that he remit the monthly payments into escrow. Supreme Court granted the motion; this Court later reversed and denied the motion (177 AD3d 1056, 1057-1058 [3d Dept 2019]).

Footnote 4: We do not evaluate the propriety of the conflicting language of the shareholders' agreement in requiring an immediate, irrevocable transfer that is subject to a later disposition via appeal thereby revoking the transfer. Therefore, our decision herein should not be interpreted as accepting the validly of this process.

Footnote 5: The K-1 issued to plaintiff for the year 2007 reflected that he had a 22.19% interest — an amount consistent with owning a 45% interest until June, or approximately one-half of the year, and then owning a 0% interest for the remainder of the year. Thereafter, plaintiff did not receive a K-1 indicating any ownership interest, and defendant's annual K-1 forms reflected that he owned 100% of both dealerships.

Footnote 6: The purported footnote provides that, in the event that plaintiff is acquitted of the murder charges, defendant's monthly payments made to plaintiff while he was incarcerated shall be deemed "salary" and the note requiring such payments be marked paid in full. It bears noting that the propriety of this footnote is undermined for several reasons that were recognized by Supreme Court. However, we additionally note our observation that, at the time that the shareholders' agreement and the side agreement were drafted and signed, the parties had not contemplated that any of defendant's monthly payments were to be made directly to plaintiff. Rather, defendant's monthly payments were to be made to an irrevocable trust that was to be created for the benefit of plaintiff's children. It was not until the June 2007 transaction where, for the first time, the record demonstrates that the parties agreed for defendant to directly pay plaintiff. The fact that the footnote reflects this change, despite allegedly being included in the shareholders' agreement a year earlier, supports defendant's position that the footnote was added into the shareholders' agreement at some point after the June 2007 transaction.

Footnote 7: Defendant also testified that he was not sure who had put the footnote into the shareholders' agreement as it was not contained in any of the various drafts.